## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**MOUNTAIN PURE, LLC, ANGELA SMITH,**
**GERALD MILLER, COURT STACKS,**
**KIMBERLY HARBESON, SCOTT MORGAN,**
**TRACY BUSH, QUINTON RILEY, KADEENA**
**DEPRIEST, WILLIAM MORRIS**                                    **PLAINTIFFS**

**v.**                              **Case No. 4:13-cv-00119-KGB**

**CYNTHIA M. ROBERTS,**
**BOBBI SPRADLIN, AND JOHN DOES 1-20**                **DEFENDANTS**

### OPINION AND ORDER

On March 6, 2013, plaintiff Mountain Pure, LLC, and individual plaintiffs Angela Smith,

Gerald Miller, Court Stacks, Kimberly Harbeson, Scott Morgan, Tracy Bush, Quinton Riley,

Kadeena DePriest, and William Morris, who are employees of Mountain Pure, filed this action

asserting Fourth Amendment claims under *Bivens v. Six Unknown Agents of Federal Bureau of*

*Narcotics*, 403 U.S. 388 (1971), against Special Agents Cynthia M. Roberts and Bobbi Spradlin

(together, "named defendants"), as well as other agents named as John Does 1-20 (Dkt. No. 1).

On December 20, 2013, plaintiffs filed an amended complaint (Dkt. No. 20).   Specifically,

plaintiffs allege that named defendants Ms. Roberts and Ms. Spradlin planned and executed a

search of the Mountain Pure bottling plant that allegedly violated their constitutional rights under

the Fourth Amendment.   On January 24, 2014, named defendants filed two motions for summary

judgment, one against Mountain Pure (Dkt. No. 46) and the other against individual plaintiffs

(Dkt. No. 49), both of which have been fully briefed.   For the reasons that follow, named

defendants' motions for summary judgment are granted.

I.      **Factual Background**

Unless otherwise noted by citation, the following facts are taken from named defendants' statement of facts as to which there is no genuine issue for trial regarding claims of plaintiff Mountain Pure, LLC (Dkt. No. 48); named defendants' statement of facts as to which there is no genuine issue regarding the claims of individual plaintiffs (Dkt. No. 50); and plaintiffs' responses to those statements of facts (Dkt. Nos. 54, 57).

At all times relevant to this case, named defendant Ms. Roberts was a Special Agent for the Office of the Inspector General of the Small Business Administration ("SBA-OIG"), and named defendant Ms. Spradlin was a Special Agent for the Criminal Investigation Division of the Internal Revenue Service ("IRS-CID").   Named defendants were case agents in the investigation of John B. Stacks for alleged false statements, misrepresentations, wire fraud, and money laundering regarding a Small Business Administration loan to Mountain Pure.

As part of that investigation, Ms. Spradlin filed for and received a warrant to search the bottling plant and to seize certain paper and electronically-stored records.   The warrant authorized the search for and seizure of, among other things, "any and all business records," including billing invoices, ledgers, accounts receivables, accounts payable, shipping logs, and QuickBooks files; "any and all purchasing records," including invoices, asset lists, purchase agreements, and lease agreements; and certain of Mountain Pure's computers or electronic media, including documentation and manuals necessary to access them (Dkt. No. 59-5).

Ms. Roberts prepared an operational plan for the search.   On January 18, 2012, at approximately 8:45 a.m., pursuant to the search warrant and with named defendants acting as team leaders, approximately 35 federal and state law enforcement agents searched the Mountain Pure bottling plant.   The agents approached the bottling plant in a long convoy of 15 to 20

vehicles with lights flashing and sirens blaring.  They surrounded the plant and blocked all entrances and exits.  Each officer was wearing a ballistic vest and was armed with a government-issued handgun, secondary weapon (either a collapsible baton or pepper spray), and handcuffs—all of which is required for the execution of any search warrant pursuant to SBA-OIG and IRS-CID policies.

Agents conducted a security sweep and secured the premises, eventually moving occupants of the bottling plant's offices to the break room.  Upon entry into the building, agents shoved Mr. Morgan and Mr. Bush against a wall.  There is a dispute as to whether agents had drawn their weapons at this time, though it is undisputed that named defendants Ms. Roberts and Ms. Spradlin neither drew their weapons nor directed any search team member to do so.  Mr. Court Stacks testified that an agent drew his gun upon entering his office.  Mr. Miller claims that he was detained outside and brought into the bottling plant.

Agents either confiscated cell phones from individual plaintiffs upon their entry to the break room or directed that cell phones be left behind at desks or in purses, bags, or cars. Individual plaintiffs were not allowed to make calls for most of the duration of the search. According to Ms. DePriest, "the phones were shut off, not just personal phones taken, but the phone lines shut down.  We couldn't make any out-going or incoming calls at all whatsoever" (Dkt. No. 50-10, at 4-5).  Mr. Stacks and Ms. DePriest asked to make personal phone calls, and Mr. Bush asked to call an attorney (Dkt. No. 55-2, at 14).  Other employees who are not plaintiffs asked to make calls to arrange for children to be picked up and other similar things (*Id.* at 12-13).  In addition to cell phones, agents seized an iPod Touch from Ms. Smith; firearms from Mr. Bush and Mr. Morgan; pocket knives from Mr. Riley and Mr. Morgan; a thumb drive and hard drive from Mr. Morgan; and personal property from Ms. DePriest.  Specifically, agents

seized from Ms. DePriest two white, five-inch binders labeled "Confidential Property of CoorsTek Internal Auditing Program"; one blue, half-inch binder containing completed tax forms and tax schedules from college classes; and a 2006 tax accounting college textbook.

Agents also interviewed all individual plaintiffs, though the extent of the interviews differed, most apparently lasting between 30 minutes and 1.5 hours.  At least one individual defendant, Mr. Bush, testifies that named defendants told him that he could not leave until he submitted to interrogation (*Id.* at 16); the amended complaint alleges that other individual plaintiffs were told the same.

Once all the bottling plant employees were identified, which evidence suggests took approximately two hours, production restarted.  By sometime between 1:30 and 4:00 p.m., all individual plaintiffs had been told that they could leave but that, if they did, they could not come back.  Ms. Smith left when the agents told her that she could leave, whereas Ms. Harbeson testified that she left around 2:15 or 2:30 p.m.  The search concluded at approximately 8:20 p.m. Some individual plaintiffs might have been told earlier in the day that they could leave but that, if they did, they could not come back.  Mr. Stacks stayed until 8:00 p.m., and agents denied him permission to call his wife until 4:00 or 5:00 p.m.  Mr. Morgan chose to stay and was allowed to call his mother at 5:00 p.m., though it appears that he had not previously asked to do so (Dkt. No. 50-6, at 9).  Mr. Miller left at 8:30 p.m.  Mr. Bush left when the search concluded. It appears that agents told Ms. DePriest that she could leave earlier than the others because of her job duties, but she chose to stay.  Mr. Morris and Mr. Riley were allowed to return to work around the time production restarted at the plant and left between 2:30 and 3:00 p.m., at the end of their shifts.

No Mountain Pure property was damaged, no one was handcuffed or arrested, and no one sustained a physical injury. Agents returned cell phones, Ms. Smith's iPod, firearms, and pocket knives when the individuals who claimed ownership of the property left or upon conclusion of the search pursuant to the search warrant, whichever occurred first. Mr. Morgan's thumb drive and hard drive were returned a few days after the search, upon his request. Ms. DePriest's binders and college textbook have not been returned, though it appears she never actually requested their return from the agents and the college textbook is not listed as an item that was seized.

## II.     Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A government official sued in his individual capacity may raise the affirmative defense of qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted). To determine if qualified immunity applies, the Court must conduct a two-prong inquiry by examining: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right and (2) whether the constitutional right violated was clearly established at the time of defendant's alleged misconduct." *Id.* (alteration in original) (internal quotation marks omitted). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). The Supreme Court has held that the qualified immunity analysis in a *Bivens* action is identical to that in a 42 U.S.C. § 1983 lawsuit. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

To conclude that the right that the government official allegedly violated is clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Though a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Courts should not "define clearly established law at a high level of generality." *Id.* at 2084. The Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply generally, well-developed

legal principles." *Coates v. Powell*, 639 F.3d 471, 476 (8th Cir. 2011) (quoting *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989)); *see Mettler v. Whitledge*, 165 F.3d 1197, 1202-03 (8th Cir. 1999) ("[T]his generalized right to be free from an unreasonable use of excessive force during a police seizure does not clearly establish a right for purposes of a qualified-immunity analysis.  Rather, [plaintiff] must show the right was clearly established in a particularized sense relevant to the case at hand." (citations omitted)).  "Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002) (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Moreover, the Eighth Circuit has held that, "[i]n the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." *Buckley v. Rogerson*, 133 F.3d 1125, 1129 (8th Cir. 1998) (quoting *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993)).

### III.   Claims Against John Doe Defendants

Because the parties agree that all claims against John Does 1-20 should be dismissed, the Court dismisses without prejudice all claims against them.  Although defendants request that the claims against the John Doe defendants be dismissed with prejudice, defendants do not cite a controlling case in support of this request, and Federal Rule of Civil Procedure 4(m) provides for dismissal without prejudice where defendants have not been served within 120 days after the complaint is filed.

### IV.   Potential Liability Of Named Defendants

The parties appear to agree that named defendants Ms. Roberts and Ms. Spradlin may be liable for violations caused by their own actions or violations in which they participated, that

7

they ordered, or that they condoned.  *See Hummel-Jones v. Strope*, 25 F.3d 647, 653 n.10 (8th Cir. 1994); *see Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) ("The requisite causal connection can be established not only by some kind of direct personal participation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injury."); *see also Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir. 1990) (citing *Johnson v. Duffy* favorably).  Plaintiffs also attempt to assert claims for alleged failure to train, supervise, and control subordinates.  However, as the Court previously stated in its Order on defendants' motion to dismiss, plaintiffs did not allege in their amended complaint a failure to supervise claim against named defendants (Dkt. No. 32).  Likewise, plaintiffs did not allege a separate failure to train or control claim against named defendants.

## V.      Unconstitutional Search Claim

Because the Fourth Amendment protects citizens against only unreasonable searches, officers do not violate the Fourth Amendment when they execute a valid warrant in an objectively reasonable manner, which is a standard that ignores officers' subjective intent.  *See L.A. Cnty. v. Rettele*, 550 U.S. 609, 614 (2007) ("The test of reasonableness under the Fourth Amendment is an objective one."); *Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."); *Lykken v. Brady*, 622 F.3d 925, 930 (8th Cir. 2010) ("We review [officers'] conduct for objective reasonableness, ignoring [officers'] subjective intent."); *Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994) ("The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness.").  A search has occurred for purposes of the Fourth Amendment when a reasonable expectation of privacy has been infringed.  *United States v. Va*

*Lerie*, 424 F.3d 694, 701 (8th Cir. 2005).   To determine whether a particular search or seizure was conducted in a reasonable manner, courts must examine "whether the totality of the circumstances justified a particular sort of search and seizure."   *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

The Fourth Amendment's Search Clause and Seizure Clause are "wholly distinct" and provide different protections against government conduct.   *Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1041 (8th Cir. 2013); *Va Lerie*, 424 at 701.   Individual plaintiffs admit that they have no standing to challenge the search at the bottling plant, only the seizure of their persons and their own private property, claims which are analyzed below.

Mountain Pure has standing to challenge the search at the bottling plant and asserts that named defendants planned the search, which included interviewing all accounting, human resources, and administrative employees and seizing all cell phones of all employees (Dkt. No. 53-1, at 2).   According to Mountain Pure, named defendants lacked any information that any employee at the plant was armed or dangerous and knew that they were investigating an alleged economic, non-violent crime (*Id.* at 3).   Despite this, named defendants' planned search included approximately 35 agents, who wore bullet-proof vests, firearms, handcuffs, and batons and arrived at the bottling plant in 15 to 20 vehicles with lights flashing and sirens blaring (*Id.*).   The agents surrounded the building, blocking all entrances and exits (*Id.*).   Mountain Pure does not claim that any property was destroyed during the search.

Mountain Pure contends that "[a] search may be unreasonable if excessive force was used in conducting the search" and that excessive force was used here (*Id.* at 4).   In support of its argument, Mountain Pure cites cases analyzing excessive use of force, but most of the cases cited seem to analyze the excessive use of force in an allegedly unreasonable seizure of persons, not

claims involving an allegedly unreasonable search.  *See Graham v. Connor*, 490 U.S. 386, 388

397 (1989); *Baird v. Renbarger*, 576 F.3d 342, 344 (7th Cir. 2009); *Estate of Smith v. Marasco*,

430 F.3d 140, 148-49 (3d Cir. 2005) (stating that search may become unreasonable through use

of excessive force but analyzing an unreasonable seizure of persons claim); *Estate of Redd v.

Love*, Case No. 2:11-CV-478-RJS, 2014 WL 5305940, at *5 (D. Utah Oct. 15, 2014).  *But see

Rush v. City of Mansfield*, 771 F. Supp. 2d 827, 858-59 (N.D. Ohio 2011).  In response, named

defendants assert that, because the right to be free from excessive use of force from officers is a

right under the Fourth Amendment's Seizure Clause, cases examining alleged excessive use of

force in seizure of persons are inapplicable to a claim of unreasonable search of property (Dkt.

No. 60, at 4 (citing *Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012) ("[T]he right to

be free from excessive force dates back to the adoption of the Bill of Rights of our Constitution,

as it is a clearly established right under the Fourth Amendment's prohibition against

unreasonable seizures of the person." (citations omitted) (internal quotation marks omitted))).  At

the very least, even if the use of excessive force may make a search unreasonable, the Court is

not convinced that such law is clearly established based on the cases cited by the parties.

Regardless, even if it were clearly established that the use of excessive force may make a

search unreasonable, based on the record before the Court, Mountain Pure cannot establish that

use of excessive force occurred here.  Mountain Pure cites no cases in which the use of standard

law enforcement weapons and gear, without more, was found to be unreasonable.  Cases cited by

Mountain Pure involve the use of SWAT teams, weapons, or gear during searches or seizures

related to non-violent crimes and without a known threat to safety.  *See Baird*, 576 F.3d at 346-

47 (finding use of nine millimeter submachine gun to detain persons at search site objectively

unreasonable); *Estate of Redd*, 2014 WL 5305940, at *2, 5 (finding use of assault rifles and flak

jackets constituted use of excessive force); *Rush*, 771 F. Supp. 2d at 859 (rejecting defense of qualified immunity where use of SWAT team to execute search warrant). But Mountain Pure provides no evidence that SWAT-type tactics, weapons, or gear were used here, and all record evidence before the Court suggests that they were not. Instead, the record evidence before the Court is that agents were armed and equipped with standard law enforcement weapons and gear that is typically carried and required on any law enforcement operation (Dkt. Nos. 48-1, at 4-5; 48-2, at 3-4; 48-3, at 2-4), and that the tactics used were objectively reasonable under the circumstances (Dkt. Nos. 48-2, at 4; 48-3, at 3-5 (explaining that the number of officers was based on number of persons expected to be present and size of the facility, and that use of convoys and blocking of entrances and exits are to control access, ensure officer safety, and prevent disruption of the search)). In fact, Mountain Pure appears to abandon any claim that a "SWAT raid" was conducted (Dkt. No. 53-1, at 5 ("Defendants contend that there was no excessive use of force because defendants did not conduct a SWAT raid. But, the analysis does not depend on whether a SWAT raid was conducted . . . .")). As for Mountain Pure's claim that some agents had weapons drawn, there is no evidence that named defendants Ms. Roberts or Ms. Spradlin drew their weapons or participated in, ordered, or condoned the drawing of weapons by other agents.

Individual plaintiffs' claims of excessive use of force against them have even less bearing on whether the search itself was reasonable, as those claims more directly involve the seizure of those individual plaintiffs by individual agents, not the overall search. Even so, the Court determines that, based on the record evidence before it and for the reasons explained below, individual plaintiffs' claims of excessive use of force have no merit. For all of these reasons,

named defendants Ms. Roberts and Ms. Spradlin are entitled to qualified immunity on Mountain Pure's unconstitutional search claim.

## VI.    Unconstitutional Seizure of Persons (Detention) Claims

The individual plaintiffs also bring claims.  To begin, the Court notes that individual plaintiffs have not brought Fifth Amendment claims here.  Thus, to the extent that individual plaintiffs complain of not being afforded counsel upon request, such a Fifth Amendment claim is not before this Court.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The individual plaintiffs do bring Fourth Amendment claims.  The Fourth Amendment protects against the unreasonable seizure of persons.   Under the Fourth Amendment reasonableness standard, agents executing a search warrant may "detain the occupants of the premises while a proper search is conducted . . . because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)); *see Summers*, 452 U.S. at 702-03 (stating that legitimate law enforcement interests supporting detention include (1) "preventing flight in the event that incriminating evidence is found," (2) "minimizing the risk of harm to the officers," and (3) the "orderly completion of the search," which "may be facilitated if the occupants of the premises are present"); *see also Barrera v. U.S. Dep't of Homeland Sec.*, Civil No. 07-3879, 2009 WL 825787, at *5 (D. Minn. Mar. 27, 2009) (holding that agents were allowed to seize and question occupants of business while executing search warrant for illegal aliens).  "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler*, 544 U.S. at 98.  However, although initial detention is authorized by the need to achieve legitimate law enforcement

interests, "a lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 101 (citation omitted) (internal quotation marks omitted); *see Lykken*, 622 F.3d at 932.

The Court first must consider whether individual plaintiffs were seized. A seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (citations omitted) (internal quotation marks omitted). Based on the record before the Court viewed in the light most favorable to individual plaintiffs, a reasonable juror might conclude that all individual plaintiffs were seized at one point or another during execution of the warrant. Ms. DePriest, who asked to enter the bottling plant upon her arrival, does not appear to have been initially seized, though her detention may have become a seizure sometime after she entered the bottling plant. Moreover, in the Court's view, any alleged seizure of individual plaintiffs only lasted until they were given the opportunity to leave, which even by individual plaintiffs' own accounts occurred sometime between 1:30 and 4:00 p.m. for most individual plaintiffs. Named defendants maintain that employees were told throughout the day at various times beginning in the morning that they could leave but that, if they left, they could not come back (Dkt. No. 60-1, at 2).

Assuming without deciding for purposes of this analysis that all individual plaintiffs were seized, the Court turns to individual plaintiffs' argument that the manner of their seizure or detention was unreasonable, particularly due to the fact that they were held incommunicado for a period of time. In support of this claim, individual plaintiffs cite *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003). In *Ganwich*, officers detained employees of a business being searched, holding them incommunicado and threatening continued detention to coerce them to submit to

interrogations. *Id.* at 1118. Officers explicitly told the employees that they would be held in the waiting room until they submitted to individual interviews with police investigators in the back room. *Id.* Employees were not allowed to leave the waiting room, go to the restroom unattended, retrieve personal possessions, make telephone calls, or answer the phone when it rang. *Id.* The Ninth Circuit found objectionable officers' "preventing the plaintiffs from making a telephone call for extended times during the detention" because "officers may prevent temporary detainees from using a telephone only so long as that restriction is 'carefully tailored to its underlying justification'" and because "[e]ven if at the start the officers had an interest in preventing the plaintiffs from making a telephone call, the officers' interest was soon outweighed by the plaintiffs' stronger interests in contacting relatives." *Ganwich*, 319 F.3d at 1123 (citing *Florida v. Royer*, 460 U.S. 1319, 500 (1983)). The *Ganwich* court also was concerned about officers using the plaintiffs' continued detention to coerce them into submitting to interrogations. *Id.* at 1124.

Here, all individual plaintiffs claim that they were questioned and held incommunicado, with the bottling plant's phone lines being disconnected, for several hours after the bottling plant was secured. However, the facts here are distinguishable from those in *Ganwich*. Specifically, although all individual plaintiffs appear to contend that the circumstances implied that they could not leave until they submitted to interrogation, only Mr. Bush testifies that he was explicitly told he could not leave until he submitted to interrogation (Dkt. No. 55-2, at 16); individual plaintiffs' amended complaint alleged that others were told the same, but there is no evidence in the record confirming it. *See United States v. Monroe*, 322 Fed. App'x 552, 554 n.1 (9th Cir. 2009) (distinguishing *Ganwich* because defendant "was never told his release was conditioned on

submitting to interrogation"); *Williams v. Cnty. of Santa Barbara*, 272 F. Supp. 2d 995, 1015 (C.D. Cal. 2003) (same).

Further, based on the record evidence before the Court viewed in the light most favorable to individual plaintiffs, only Mr. Stacks and Ms. DePriest, and maybe Mr. Morgan, claim they asked to make a personal phone call similar to the requests for calls made and found by the court as persuasive in *Ganwich*. Mr. Bush did not make such a request; instead, he asked to call an attorney. At that point in the encounter, Mr. Bush had no legal right to counsel and, as explained by the Court above, makes no claim to counsel here. *See United States v. Gouveia*, 467 U.S. 180, 187 (1984) ("[T]he right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant.").

Regardless, all individual plaintiffs who chose to stay after being given the opportunity to leave, including Mr. Bush, continued to be held incommunicado after being questioned, showing that the purpose of holding individual plaintiffs incommunicado was not to coerce them to submit to questioning. Even if named defendants told Mr. Bush or other individual plaintiffs that they would be held until they submitted to questioning, there is no evidence that named defendants held individual plaintiffs incommunicado for the purpose of coercing them into submitting. *See Bybee v. Erath*, 304 Fed. App'x 579, 582 (9th Cir. 2008) (distinguishing *Ganwich* because plaintiffs did not allege or show "they were held incommunicado for the purpose of coercing them into submitting to interrogation"). For all of the reasons above, applying the law in *Ganwich*, and based on the record evidence before the Court viewed in the light most favorable to the individual plaintiffs, the Court finds that a reasonable juror could not conclude that named defendants unreasonably detained individual plaintiffs.

Even if a reasonable juror could conclude that named defendants unreasonably detained individual plaintiffs based on *Ganwich*, the Court would not find individual plaintiffs' alleged constitutional rights under *Ganwich* clearly established.  Given subsequent Supreme Court decisions on these issues, particularly *Muehler*, 544 U.S. at 98, and Ninth Circuit case law distinguishing and limiting *Ganwich*, this Court determines that the contours of the constitutional right found by *Ganwich* are not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

In addition to the above claim asserted by all individual plaintiffs, individual plaintiff Mr. Miller contends that his seizure was unreasonable because, according to Mr. Miller, he was detained outside and then brought inside the bottling plant.  Pursuant to *Bailey v. United States*, the categorical rule in *Muehler* and *Summers* is limited to detaining occupants of the premises being searched or non-occupants within the immediate vicinity, unless justified by some other rationale.  133 S. Ct. 1031, 1042-43 (2013).  Based on the record evidence viewed in the light most favorable to Mr. Miller, a reasonable juror might conclude that he was neither an occupant of the premises being searched nor within the immediate vicinity.  *See Bailey*, 133 S. Ct. at 1042 (stating that, to determine what is in the immediate vicinity of the premises to be searched, a court may consider "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors").  However, *Bailey* was not decided until February 19, 2013, over a year after the search of the bottling plant occurred.  As a result, this Court concludes that Mr. Miller's constitutional right was not clearly established at the time of the search.  For all of the reasons above, the Court concludes that named defendants Ms. Roberts and Ms. Spradlin are entitled to qualified

immunity and summary judgment in their favor on all individual plaintiffs' seizure of person or detention claims.

### VII.   Excessive Use Of Force Claims

Individual plaintiffs also bring excessive use of force claims against named defendants Ms. Roberts and Ms. Spradlin.  Again, the right to be free from excessive use of force from officers is a right under the Fourth Amendment's prohibition against unreasonable seizures of the person, and this right has been clearly established.  *Shekleton*, 677 F.3d at 367.  Courts must determine whether the amount of force used was objectively reasonable under the particular circumstances.  *See Graham*, 490 U.S. at 397.  "[T]he level of force used must be justified in light of 'the severity of the crime at issue,' the suspect's flight risk, and the immediacy of the risk posed by the suspect to the safety of officers and others."  *Shekleton*, 677 F.3d at 367 (quoting *Graham*, 490 U.S. at 396).  In calculating reasonableness, courts must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396.  "Not every push or shove, even if it may later seem unnecessary for the peace of a judge's chambers, violates the Fourth Amendment."  *Id.* (citation omitted) (internal quotation marks omitted)).  Further, the authority to use reasonable force to effectuate the detention is inherent in the authorization to detain an occupant of the place to be searched.  *Muehler*, 544 U.S. at 98-99.

For the same reasons discussed above regarding Mountain Pure, the Court determines that individual plaintiffs cannot establish that excessive use of force occurred based on the tactics, weapons, or gear used to effectuate the search.  Individual plaintiffs Mr. Stacks, Mr. Bush, and Mr. Morgan also bring separate excessive use of force claims.  First, Mr. Stacks

17

claims that agents held him at gun point upon entering his office, but he admits that this was after Mr. Stacks was initially noncompliant by failing to open the door when officers knocked, announced, and asked that it be opened, perhaps due to a misunderstanding, and agents were forced to open the closed door without knowing what was behind it.  Second, Mr. Bush and Mr. Morgan claim that they were shoved against the wall when the agents entered the building.

The Court is not convinced that these events, even when viewed in the light most favorable to Mr. Stacks, Mr. Bush, and Mr. Morgan, rise to the level of constitutional violations. Regardless, named defendants Ms. Roberts and Ms. Spradlin were not involved in these events, and there is no evidence suggesting that named defendants participated in, ordered, condoned, or set these events in motion.  On the record evidence before the Court, expanding named defendants' potential liability to this alleged conduct would be inconsistent with the case law. *See Johnson*, 588 F.2d at 743-44 ("The requisite causal connection can be established not only by some kind of direct personal participation, but also by setting in motion a series of acts by others which the actor *knows or reasonably should know* would cause others to inflict constitutional injury." (emphasis added))

### VIII.   Unconstitutional Seizure Of Property Claims

The Fourth Amendment also protects against the unreasonable seizure of property.  "A seizure of property under the Fourth Amendment occurs when there is 'some meaningful interference with an individual's possessory interests in that property.'"  *Burlison*, 708 F.3d at 1039 (quoting *Dixon v. Lowery*, 302 F.3d 857, 862 (8th Cir. 2002)).  Not all government interferences are seizures:  "the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property."  *Va Lerie*, 424 F.3d at 702.

When a seizure of property occurs, however, the Fourth Amendment demands that it be reasonable, and reasonableness depends on the context of the seizure. *Burlison*, 708 F.3d at 1039 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985)).  Accordingly, where a search warrant has been issued, the seizure of property outside the scope of that warrant is a Fourth Amendment violation only if the mistake in seizing the property was objectively unreasonable. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536-37 (8th Cir. 1999) "[T]he fact that [the officer] was in error does not in itself make the seizure unreasonable."); *Walden v. Carmack*, 156 F.3d 861, 873 (8th Cir. 1998) ("In order to show that a law enforcement official is not entitled to qualified immunity with regard to the execution of a search warrant, the appellees must establish that from the perspective of a reasonably objective police officer on the scene . . . their conduct was not objectively reasonable."); *see also Dawkins v. Graham*, 50 F.3d 532, 534 (8th Cir. 1995) ("[T]he Fourth Amendment's allowance for officers' honest mistakes is limited to mistakes that are objectively reasonable.").  Moreover, officers executing a search warrant "are not obliged to interpret narrowly." *McClendon v. Story Cnty. Sheriff's Office*, 403 F.3d 510, 517 (8th Cir. 2005).  The Fourth Amendment's protection against seizure of one's property in the absence of a warrant, an equivalent court order, or circumstances justifying a recognized exception to the warrant requirement is clearly established. *See Walden*, 156 F.3d at 868-69 (upholding denial of qualified immunity where officer allegedly seized items outside the boundaries of that described in search warrant and did not posit a reasonable belief that the items were located within such boundaries).

### A.      Mountain Pure's Property

Mountain Pure claims that property outside the scope of the warrant was seized and that no reasonable officer could mistake the items seized as being within the scope of the warrant.

The warrant authorized the search for and seizure of, among other things, "any and all business records," including billing invoices, ledgers, accounts receivables, accounts payable, shipping logs, and QuickBooks files; "any and all purchasing records," including invoices, asset lists, purchase agreements, and lease agreements; and certain of Mountain Pure's computers or electronic media, including documentation and manuals necessary to access them (Dkt. No. 59-5).   Mountain Pure contends that the agents seized "pasteurizer drawings, electrical and plumbing schematics, operating manuals for Debagger machinery, century bottle palletizer input/output listing and notes, 2.5 gallon palletizer PLC program printout, 6X1 gallon palletizer notes and quotes, flex RO notes and schematics, and a[n] AquaChem distiller book and manual with notes" (Dkt. No. 53-1, at 7).   Mountain Pure appears to admit that these things were found in an upstairs storage office (Dkt. No. 54, at 8-9).

Named defendants make two arguments regarding Mountain's Pure's claim.   First, named defendants argue that they cannot be held liable for the seizure of the items listed by Mountain Pure because they did not personally seize those items nor direct any agent to seize them.   Even so, Mountain Pure states that Ms. Spradlin testified that she and Ms. Roberts were responsible for determining what items could be seized and that all items seized were eventually turned over to her as the custodian of the evidence, though it took months for the named defendants to review the seized items (Dkt. No. 52-2, at 13-15).   Ms. Roberts testified that named defendants would answer questions about a particular document if asked but did not make sure that what was seized was within the warrant (Dkt. No. 52-1, at 35).   Given this testimony and viewing it in the light most favorable to plaintiffs, named defendants may be responsible for the conduct of the agents who did seize the items based on named defendants' participation in,

condoning, or setting in motion the conduct.  *Jones*, 25 F.3d at 653 n.10; *see Johnson*, 588 F.2d at 743-44.

Second, named defendants assert that a reasonable officer could believe that seizure of these items was authorized by the warrant.  This is because the items indicate purchase of the equipment or are business records of Mountain Pure, and the warrant authorized the seizure of purchasing records and business records of Mountain Pure (Dkt. No. 59-5).  Although the warrant's list of things to be included in "purchasing records" or "business records" did not specifically include such items, based on the record evidence viewed in the light most favorable to Mountain Pure, the Court determines that a reasonable officer could believe that the list of things to be included in "purchasing records" and "business records" was not exhaustive and was broad enough to encompass the items at issue.  Thus, named defendants' motion for summary judgment is granted as to Mountain Pure's unreasonable seizure of property claim.

## B.    Individual Plaintiffs' Property

Individual plaintiffs also bring unconstitutional seizure of property claims against named defendants Ms. Roberts and Ms. Spradlin.  To the extent that named defendants argue that they cannot be held liable for other agents' seizure of individual plaintiffs' property, the Court rejects that argument for the same reason it rejects the argument as made by Mountain Pure.  Given the testimony before the Court and viewing it in the light most favorable to plaintiffs, named defendants may be responsible for the conduct of the agents who did seize the items based on named defendants' participation in, condoning, or setting in motion the conduct.  *Jones*, 25 F.3d at 653 n.10; *see Johnson*, 588 F.2d at 743-44.  However, for the reasons below, the Court grants named defendants' motion for summary judgment as to individual plaintiffs' unreasonable seizure of property claims.

1.      **Cell Phones And Electronic Devices**

Individual plaintiffs claim that named defendants unreasonably seized their cell phones or electronic devices.  Named defendants claim that only Mr. Bush, Mr. Miller, Mr. Morgan, Mr. Riley, and Mr. Morris had their cell phones taken upon entry to the break room, while Mr. Stacks, Ms. Harbeson, Ms. DePriest, and Ms. Smith were merely told to leave their cell phones behind on their desk or in their purse, bag, or car.  All cell phones were returned to individual plaintiffs when they left Mountain Pure or the search ended, whichever occurred first.  Ms. Smith's iPod Touch, which she admits looked like an iPhone (Dkt. No. 50-8, at 5), was taken upon her entry to the break room. Ms. Smith forgot her iPod Touch when she left Mountain Pure, but it was returned to her when she came back to retrieve it.

Named defendants argue, without citation to any authority, that no seizures occurred as to those cell phones that were merely left behind.  Individual plaintiffs respond, also without citation to any authority, that seizures occurred because individual plaintiffs were deprived of the use of their cell phones at the direction of agents, pursuant to orders from named defendants.  For purposes of this analysis, the Court assumes without deciding that cell phones left behind at the direction of agents were seized within the meaning of the Fourth Amendment.

Based on the record evidence before the Court viewed in the light most favorable to individual plaintiffs, the seizures of cell phones and electronic devices that resembled cell phones was reasonable to conduct an orderly search, protect agents, and preserve evidence.  Even if a reasonable juror could conclude such seizures unreasonable, individual plaintiffs cite no authority showing that their constitutional right not to have their cell phones seized under the circumstances here was clearly established.  *Ganwich*, for example, dealt with whether holding

employees incommunicado made the seizure of persons unreasonable, not whether seizure of cell phones alone was an unreasonable seizure of property. *See Ganwich*, 319 F.3d at 1123.

### 2.    Guns And Knives

Individual plaintiff Mr. Bush claims that named defendants unreasonably seized his firearm, individual plaintiff Mr. Riley claims that named defendants unreasonably seized his pocket knife, and individual plaintiff Mr. Morgan claims that named defendants unreasonably seized his firearm and pocket knife. The Eighth Circuit has held that officers may take "reasonable precaution to assure the safety of all persons on the premises during the search." *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979). Mr. Bush, Mr. Riley, and Mr. Morgan did not respond to named defendants' motion for summary judgment to explain how the agents' seizure of their weapons was an allegedly unreasonable precaution. Based on the record evidence viewed in the light most favorable to individual plaintiffs, the Court determines that the seizure of firearms and pocket knives was reasonable.

### 3.    Mr. Morgan's Thumb Drive And Hard Drive

Individual plaintiff Mr. Morgan claims that named defendants unreasonably seized his personal thumb drive and computer hard drive, which were outside the scope of the warrant. Named defendants argue that the thumb drive and hard drive, which were not marked as personal items, clearly fall within paragraph 3 of attachment A of the warrant, which allows the seizure of "any computer hard drive or other electronic media . . . that is called for by this warrant, or that might contain things otherwise called for by this warrant" (Dkt. No. 59-5). The Court agrees with named defendants, and Mr. Morgan does not respond to named defendants' motion for summary judgment as to this claim. Even if the thumb drive and hard drive did not fall within attachment A, paragraph 3 of the warrant, based on the record evidence viewed in the light most

favorable to individual plaintiffs, the Court concludes that a reasonable agent could believe that these items did.

### 4.    Ms. DePriest's Personal Property

Individual plaintiff Ms. DePriest claims that named defendants unreasonably seized two white, five-inch binders labeled "Confidential Property of CoorsTek Internal Auditing Program"; one blue, half-inch binder containing completed tax forms and tax schedules used in one of her college classes; and a 2006 tax accounting college textbook.  Ms. DePriest states that the white binders were stored with "guidelines, regulations, and rule books," and that no business records were in the cabinet with the blue binder, which contained completed tax forms marked "sample assignment" for a college class (Dkt. No. 56-1, at 11).  Ms. DePriest provided Mr. Bush a list of her personal items to be returned, but these items have not been returned according to Ms. DePriest.  According to named defendants, Ms. DePriest's textbook is not listed as having been seized.  There is evidence that a Mountain Pure employee told the seizing agent that Ms. DePriest "told [the employee] if the police ever came or she was killed, destroy the documents" (Dkt. No. 51, at 25).

Named defendants first argue that the seizure of Ms. DePriest's personal property was reasonable given that the binders at issue were mixed with other business records of Mountain Pure and were not clearly identified as personal property, and considering that there is evidence that Ms. DePriest purportedly said items should be destroyed if the police came. Named defendants further appear to argue that Ms. DePriest's completed tax forms fall within the warrant, specifically paragraph 1.d., which allows for the seizure of "tax preparation records" (Dkt. No. 59-5).  Ms. DePriest responds that, if the seizing agent had looked at the contents of the binders, it would have been obvious to the agent that the binders were not authorized to be

seized under the warrant, which Ms. DePriest also claims is true of her college textbook.  Based on the record evidence before the Court viewed in the light most favorable to Ms. DePriest, particularly the warrant's broad authority for seizure of "tax preparation records," the Court determines that a reasonable juror could not conclude that Ms. DePriest's personal property fell outside the warrant or that it was unreasonable for an officer to determine it fell inside the warrant.

## IX.    Conclusion

For these reasons, the Court grants defendants' motions for summary judgment (Dkt. Nos. 46, 49).  The Court dismisses without prejudice all claims against John Does 1-20 and dismisses with prejudice all other claims.  All other pending motions are denied as moot.

SO ORDERED this the 19th day of March, 2015.

_____
Kristine G. Baker
United States District Judge